Case No. 10-654, consolidated with 10-655, 10-0936, 10-1790, 10-1846, 10-1852, People of the State of Illinois and Lisa Madigan, Attorney General of the State of Illinois, v. Illinois Commerce Commission, North Shore Gas Company, People's Gas, Light & Co. Company, Vanguard Energy Services, Prairie Point Energy, NICOR Advanced Energy, United Workers Union of America, AFL-CIO Local No. 18007, Consolation New Energy, Gas Division, Citizens Utility Board, the City of Chicago, and Retail Gas Suppliers. My name is Paul Burks. I'm an Assistant Attorney General representing the people of the State of Illinois. I will be speaking first. Good morning, Your Honors. My name is Theodore A. Dukas. I'm an attorney representing the People's Gas, Light & Co. Company and North Shore Gas Company. I will be speaking on the first issue of where the company is the infrastructure cost recovery rider. Good morning, Your Honors. My name is Brad Jackson. I'm with the law firm of Foley & Lerner from Madison, Wisconsin. I'm representing People's Gas and North Shore. Bill, you've been established in Chicago for a while, too. I get around. I'll be addressing the return on equity issues. Good morning, Your Honors. My name is John Ratnasamy. I'm from the firm of Rooney, Rippey & Ratnasamy. I will be speaking for North Shore and People's Gas on the two remaining issues, which are the pension issue and the incentive compensation issue. Good morning, Your Honors. John P. Kelleher, Special Assistant Attorney General. I'm representing the Illinois Commerce Commission, and I'm talking on the issues of incentive compensation and rider ICR. Good morning. James E. Wagon, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. I'm responding on the other two issues that are raised, the return on common equity and the rate basing of the so-called pension asset. I might add to what I've indicated to you before. We probably do not need as much assistance on the rider issues as we do on all of the remaining issues, particularly definitions of terms and some instruction on the accounting dynamic as to how it appears in the base, how it appears as the revenue requirement, how it becomes customer rate payers derivative as opposed to shareholders derivative and things of that sort, which can be very useful for the three of us and hopefully for you. You may proceed. Thank you, Your Honor. My name is Paul Burks. I'm Assistant Attorney General, and I'm representing the people of the state of Illinois. And the people are appealing the infrastructure cost recovery rider, which allows people's gas to pass through to consumers the cost of certain infrastructure investments through a monthly surcharge on each consumer's bill called a rider. Why shouldn't a second district case preempt that issue? Well, the second district case is directly on point. I don't know if preempt is the right word, but the second district addressed this exact issue, which is if you can use a rider to recover infrastructure investments. And the second district in the ComEd case said that you could not because infrastructure investments, quote, are, quote, the type of cost that should be recovered through traditional rate-making procedures. And it's a very well-reasoned opinion. Now tell us how infrastructure costs would be computed into ordinary rate-based rate-making procedures, having to do with my special request. Yes, Your Honor. Ordinary rate-making procedures are comprised basically of establishing what's called a revenue requirement, which is the total amount of money that the utility expends, all of its costs and expenses, plus its profit. Add those two things together and what you have is something called a revenue requirement, which is the amount of money that the rates are set to recoup for the utility. So if your revenue requirement is, say, $1 million over the course of a year, one year, which is all your costs and expenses plus your profit, take a round number of $1 million, then the rates are set so that the utility, if they manage their business efficiently, will recoup $1 million from consumers at the end of the year. How does that facilitate the ultimate conclusion by the commission as to the amount of your return, which should reflect risk? That's correct. How does risk get reflected in that particular type of computation? It's reflected in the rate of return. So for additional risk? I know it's reflected in the rate of return, but how does the infrastructure repair figure as a risk since it's basically voluntary, since it doesn't meet the second district standard of being unexpected and out of the control of the company? Well, that's correct. So the way that it's incorporated in the revenue requirement is that the core calculation of the revenue requirement is called rate base, which is essentially capital investments, which is the amount of money. I mean, the utility's principal function is to maintain its facilities and to make sure that they're operating. So its principal expenses are capital expenditures. So the main component of that revenue requirement is the amount of money that's invested in its capital. So the revenue requirement incorporates the capital expenditures because it is the principal amount that goes into the revenue requirement. So what the utility does is they pick a test year, any 12-month period that they want, and then they show the commission how much they've invested in capital expenditures in that 12-month period, and that goes into what I mentioned earlier, that revenue. And why should it make a difference to the S2? If that's the rationale for requiring that it go through ordinary rate-based, rate-making procedures as opposed to being specially refunded, single issue, not to consider compensating factors, et cetera, why would the second district plan be any different in its rationale other than as to its character? But how does that figure into the rationale, even if it's unexpected? By the end of the year, you know. Well, what the second district's rationale said with respect to infrastructure is that when you invest in infrastructure, when you make infrastructure improvements, there's going to be some offsetting savings somewhere within your company. If you, for example, with this particular... But why would the characteristics that would be required under the second district satisfy the need for the rider as opposed to the characteristics that are ordinarily required under preexisting case law, which don't have those special features? I understand your question. What the second district said is that when you have certain types of unexpected expenses or expenses beyond utilities' control, those expenses don't have offsetting savings in other aspects of the revenue stream. Why not? Because they're pass-throughs. Because they're, say, taxes from a federal agency or state agency. Franchise fees or... Franchise fees or a tax or the cost of gas that utilities have no control over and they're just passing that through to the consumers. So, there's no offsetting change in their operating expenses or their capital expenditures. They continue to operate as they always did with their operating expenses and their capital expenses. They just have this third party imposing a cost on them, which they're going to pass right on through. Isn't that the same that you would encounter in infrastructure repairs, even if it's not unexpected or if it's self-directed as opposed to a third party... Requirements of third parties? You still have that. Is your argument that in choosing to engage in this infrastructure repair, which necessarily will provide some savings down the line either in maintenance or repairs of incidents and maybe even an efficiency of delivery, that that is different from something that is imposed by a third party? That is exactly correct. That a third party, say, a tax that's imposed on a utility is passed through the consumer without any change or savings to any other aspect of the utility's business. An infrastructure investment like this, update and main replacement, is going to lead to savings in the operating expenses. And those savings, unless you incorporate all of this into the revenue requirement, a lot of those savings are going to be lost to consumers. So that's why infrastructure and operating expenses, the case Finkel dealt with operating expenses, the ComEd case dealt with infrastructure, those are the core components of the revenue requirement, and you lose the offset and the dynamic nature of how they impact each other if you take one out and you make a rate based on that single issue. That's what single issue rate making is. You take that out of the revenue requirement, and then you lose that, you can't keep track of the offsetting nature, the dynamic nature of how they impact. And the danger would be that the savings that would be resulting from this infrastructure repair would not be savings to consumers but would just benefit the company doing the repairs. That's exactly right. And when you use the revenue requirement, what happens is they set the revenue requirement, that one number at the end, and then the company has to run their business, and they can make more money if they run it more efficiently, right? So their incentive under the revenue requirement, the test year rule, is to reduce their cost as much as possible, be as efficient as possible. When you start taking components out and allowing single recovery for them, the incentive has changed noticeably, and now their incentive is to spend as much as possible on that single item and raise that revenue because they're getting a rate of return on that single item, and to reduce the savings, right, because they're going to get to keep that and not allow that to be passed along. Well, you know, that works in the initial approach to it, but first of all, there are other factors that are involved in rate making, even if it doesn't involve mitigation or recovery or savings through the actual service performed for which the rider is awarded. So you can have a particularly good year for the gas companies without any kind of modification of the charges that are passed through. But still, why should the company necessarily recover the pass-through if it's going to have a fantastic year in other areas that will still be appropriate to the old rate? Because the rates are set, they're supposed to approximate market conditions, so they are supposed to allow the utility the opportunity to over-recover. What is the necessity for the rider under the second district or the position taken by the commission itself? What necessitates the pass-through to justify the rider? A rider? Yeah. A rider. Not this rider. Why not wait and see what kind of year, other than other factors, such as incentives to do it more quickly, cutting down the weight that you would ordinarily have to endure during the rate-making process, things like that for which a rider provides incentive. And if that becomes the standard or the rationale, then whether the cost is imposed from without, whether it passes through, is secondary. But there may be other reasons to facilitate recovery of that expense to the company for political, social, consumer-oriented reasons. What you're referring to, those incentives that you're talking about, have essentially been rejected by the test year rule. Because what you're referring to is sort of an a la carte menu on your bill that says, the utility invests in this, so you're going to pay this much for it. They invest in this, so you're going to pay this much. And what they've done through the test year rules, the fundamental principle is we're not going to bill consumers that way. We don't think it's accurate. It requires too much central planning. It requires us to monitor every expense along the way for too long. What we're going to do instead, and most commissions work this way, is we're going to put all of the expenses into that one test year five, where all of the dynamic nature of business can work itself out, and offsetting savings can come from offsetting investments. And then we're going to see what that number is at the back end, and we're going to set rates and we're going to let the utility run its business within those rates. If those are too low, they can come back in for a rate case and we can look at it again. But if we start to say, when we say, that's not the only way to set rates, and absolutely it's not the only way to set rates. You could do your sort of a la carte menu and get a utility to get recovery for each one. We don't do it that way. But if it enhances consumer safety, to change those ducts that are corroded or whatever, or pose a possible danger, and it is totally in the hands of the utility as to when and how far to go and how to allocate the resources for it, why shouldn't the commission have discretion, a prerogative, in determining that we're going to provide an incentive to speed up the process? I don't know if it's an immediate safety concern. If we had a record that showed an immediate safety concern. I'll comment on safety, but I suppose the efficiency, the quality of service. Because what the utility does is it manages its infrastructure. That's what it does. It manages its infrastructure to maintain its safety. And the utility has told us that they have a plan for recovering the infrastructure by 2050, which is safe and reasonable, and to quote them, there's not one iota of evidence in the record that the program's immediate acceleration is necessary to prevent or eliminate a public safety concern. So they're managing their infrastructure. Are you saying it doesn't affect safety? Then if you're telling me that, you're abandoning the strict second district standards, because it becomes an issue of act rather than... Well, in a hypothetical situation where there was an absolute immediate safety concern and the utility came forward with evidence that they were unable to borrow the money in the capital markets to address the immediate safety concern, I don't know that I would come forward and say, oh, the second district's decision absolutely forecloses a rider and we've got to let something flow up. I wouldn't say that. Luckily, happily, we don't have that case. We have not one iota of evidence that there is a safety concern. And we don't have any evidence that they couldn't borrow the money in the capital market. What we have is evidence that when the capital markets tightened up, they decided strategically that they'd rather not borrow the money. They'd rather preserve their credit and they'd rather preserve their capital than invest in main replacement. And so an easier way to do it... Why would we care about that? What we care about is whether they have the power to do it. And if they have the power to do it, whether their motives are greed or necessity, shouldn't be a factor in restricting the commission's role in expediting the process. Well, they certainly have the power to do it, but the commission has restricted its own role by adopting the test year rule. And as the Supreme Court said in business and professional number two, the second business and professional case, they can change the test year rule, but they can't ignore it. And an infrastructure rider like this one is ignoring the test year rule. It's taking rate base, the core component of the revenue requirement, it's moving it out to the side, it's letting them recover it separately, and that is single issue rate making, just as the second district said. So the commission doesn't have discretion in that sense to ignore its own rules or to undermine the fundamental principles of the rate making. Well, I still don't see, and I'm going to let go of this so that you can move on with your argument, but I still don't see how the pass-through aspect of the expenditure necessarily bypasses the single issue rate making, because the rate making is a compilation of a whole range of financial dynamics occurring in the company, of which this is only one, and you can still have a situation where it may not be necessary to recover the full amount in order to stay with the, what is it, the rate of equity? Did I get that one right? It may be. That's right. That is correct, that even a pass-through is a single issue rate making, because you're passing it through and it's a single issue. But what the second district said is these types of pass-throughs, if they have these two particular conditions that attach to them, the risk is minimal. The risk, when you have a tax, it doesn't interact with your operating expenses, it doesn't interact with your capital investments. The risk of passing that through is minimal. So what happens in a real-life situation is you have a rate in place, and the city of Chicago then decides to tax the utility, so now there's an additional cost. What should the utility do? Should they go back in for a new rate case because they've just been hit with a new tax, or can they pass that through as a rider? It's just a pass-through. It's out of their control. It was unanticipated. It doesn't alter any of the factors that went into their last rate case. And your theory is if they decide, as an entity, that they want to accelerate their replacement of their ducts, then they can go in and have a rate case started that would take into consideration not only the cost of that but also the benefits to them for that. That's exactly right. And if they want to accelerate it in the future, they can use a future test year. They're allowed to do that. They're going to say in the next 12 months we're going to accelerate main replacement, we're going to replace 200 miles of main in the next 12 months. We think it's prudent. It's reasonable. We want our rates to reflect that accelerated main replacement. But it would also reflect what those savings would be in that future year, and that would all go into the revenue requirement. So an infrastructure inherently has to be part of the revenue requirement. It can't be recovered separately through a rider, as they did it here, without completely undermining it. It's antithetical to the test year rules, without completely undermining that revenue requirement as a whole. You know, I think that through your questioning, I think I've covered everything that was on my outline, so I'd like to sit down now and just reserve my five minutes for the public. Good argument. Thank you. Thank you. Good morning, Your Honor. Good morning. We're reserving five minutes for rebuttal. I'm going to speak for approximately nine minutes on the rider ICR issue and reserve the rest of our opening argument time for the other two issues that my colleagues wanted to address. Just first touching on the last point that the Attorney General's counsel made with regard to the test year rule violation. That test year rule violation was not raised as an issue under appeal, but even if it were, it would not be a basis for striking down a rider. In the 1996 Citizens Utility Board case, the Illinois Supreme Court agreed with the Commission that test year rules are not violated when there's direct recovery of a cost to a rider. So I don't want to – I don't know if there's any questions. I'll leave that at that. Your Honor, I think your questions as to why should the second district's rule be followed from the Cumberland Edison case that posed to the previous speaker were good ones, and they point out the reason why. I would appreciate that more coming from the losing side on that one. Not that it's lost at all, but in terms of when I'm complimented by the side whose acts I help grind, it means less to me. Well, fair enough, Your Honor. But it does get me into what I did want to tell the Court this morning, and it focuses on really why what the second district's test would do is inappropriate. Because, you know, if you look at the Supreme Court's decisions and the first district's decisions, the keystone for what the Commission can do is exercise discretion. It has a rate-making function. It's been said to have broad rate-making authority. It has discretion on how to operate it. It can make pragmatic adjustments, and it's not tied to just approving a rate schedule in terms of dollars and cents. And in particular, in the City of Chicago case and Citizens Utility Board cases of the Illinois Supreme Court, they said that applies to riders. In those cases, what the Supreme Court said was expressly that what the Commission's And it's important to look at what the Supreme Court did in those cases is it left it to the Commission's discretion to determine when it is appropriate to grant a rider. So therefore the clear message is that the Commission isn't supposed to be handcuffed to types of situations where that authority can be exercised. But that's exactly what applying the common law medicine case from the second district would do. It would shackle the Commission's authority to adopting riders to a list of predetermined situations, limiting them to only where there's unexpected balance with fluctuating costs. And that would be contrary. So as far as you're concerned, any time we have a rate-making element that requires outlay of any kind, the Commission at that point is free to sit back and determine whether it should accelerate recovery of that outlay, even if it's relatively routine as opposed to being once in a millennium. Essentially, yes, Your Honor. If the discretion of the Commission reviewed the evidence, and there was substantial evidence showing that this was a proper case and its determination to exercise that discretion and allow that type of recovery, and allowing that type of recovery would not violate some other established principle of law, then yes, Your Honor, that would be appropriate to exercise by the Commission. And if you look at how they've exercised the discretion in the 50 years since the Supreme Court said they can grant riders, you'll see that there's been dozens of situations. What if it's something like an inflationary cost of natural gas? Would a rider be appropriate for that if the Commission should so determine? Well, I think actually that inflationary cost of gas, the gas is currently a pass-through. I think the original rider from the City of Chicago case was a gas supply cost rider, and that's exactly right. That rider allows whatever the gas supply price is, that's the price that's passed through. So that's one of the situations where they've allowed riders. They've allowed NICOR to recover through a rider the cost of the gas storage services they choose to use. They've allowed the electrical and gas employees to recover the costs for their environmental remediation that they need to undertake. And they've allowed for the recovery of energy efficiency conservation programs that NICOR voluntarily undertook and that Peoples Gas undertook as part of its merger with its parent company. It's interesting to note that while the NICOR program was completely voluntary and how that money was going to spend was completely voluntary, the Attorney General didn't appeal that rider as being inappropriate. Where have they said no? I'm sorry, your Honor? Where have they said no? Where have they said no? Storm-expensed riders, and in particular, where they said no? This rider itself, the first time Peoples Gas tried to get it. In the previous rate case that filed in 2007, Peoples Gas asked for a similar infrastructure cost recovery rider. The Commission denied that request because it found that the company hadn't presented sufficient evidence for the Commission to exercise its discretion. What the Commission did in that case was say, here are the types of evidence we would need to look at and evaluate and apply the law to to see whether or not a proper case exists for exercising discretion. So they set forth that standard and they told Peoples Gas no at that time. In between that 2007 rate case and the rate case we're addressing here today that was filed in 2009, another gas utility, NICOR, came in and asked for a similar rider. They said, we want our infrastructure costs recovered through a rider. But the Commission told them no too. The reason why? They did not submit sufficient evidence, the types of evidence that the Commission outlined as kind of a roadmap as to what they would need to see to evaluate whether it's the proper case for a rider. So they told NICOR no. Now we come to this case. And here, following what the Commission said in the two previous decisions, Peoples Gas submitted lots of evidence. They submitted not only the testimony of their internal employee, they submitted expert testimony from a preeminent expert in the field of gas distribution systems, Mr. Salvatore Marano. And what that evidence included was, and first of all, that evidence was virtually undisputed by the other parties. That included a comprehensive cost study showing that you accelerate versus status quo or replacement program, the impact of acceleration on operating costs, it's going to reduce the costs that are going to need to be passed through to customers. That study also showed that if you leave these existing cast iron and ductile iron mains, some of them are over 100 years old, if you leave them in the ground under the city of Chicago, and they're not replaced, as they age, their failures can become unexpected and unpredictable. And by accelerating the program, the replacement program, this new system is going to have additional safety benefits. When was the last time you had a general rate case? There was a general rate case in, well, this case was 2009. The one before that was 2007. And if my memory serves, the one before that may have been, I think that was 10 or 11 years. The properties of the deterioration of these metal or iron ducts certainly were not unknown at that time. And so when the decision was made that it would be useful to the utility to accelerate their previous plan for replication or, excuse me, replacement of these cast iron mains, why was that not raised in something other than the rider, but in the general terms, which would, through the established system, would allow for the consideration of all relevant factors in deciding how this would affect the rates given to the utility? The program, and we'll say this year, is an acceleration of an ongoing program that's been going on since, I believe, 1986. And the speed by which that program has progressed has been modified over the course of that time based on the state-of-the-art studies performed. We've been doing about 1,300 miles since then out of the 4,000 plus miles. Correct. They're about halfway through. And so at one point they were going at a faster pace, although the pipe being replaced was easier to do so, so the costs of accessing and replacing weren't as much, so they were able to do more. And it involved the types of soil that the pipe was in, all these different factors that kind of make this, not that we agree that the standards should be unexpected, volatile, or fluctuating, but year-to-year the work does kind of trace volatile, unexpected, fluctuating situations and costs. But coming to 2007-2009 when this rider was sought, acceleration was sought, at that point it was determined, state-of-the-art analysis was that, well, yes, there's no current concern that this is going to have an accident tomorrow. Where there is some concern, given the aging nature of this pipe and studies in terms of how this could fail, that acceleration would be a good thing, not only because it removes the risk those pipes could pose, but because a modern system has additional safety features over and above the removal of those risks. You'd agree, though, that the general rate-setting system that the commission uses takes a look at things such as the savings that would be realized by the utility for the replacement. And if I understand your argument, it's that even though that system was designed to really take an omnibus look at all of the costs and savings that would be visited on the utility, that the commission has the discretion to try to do it in a microcosm related to this one program. Is that right? That's essentially correct, Your Honor, except that when they ran through the rider and they analyzed the rider, the rider mechanism itself, as it was designed, it was done so in the context of an aggregate rate case, examining what impact it could have on offsetting costs and other expenses. That's what I meant to say. If I wasn't clear about that, you could do that with an analysis of this one program and presumably issues of savings could be raised within the analysis of the rider, just as they could be raised in a more general rate case. Correct, Your Honor. Is that what you're arguing? Yes, and I think it's in our brief, but just briefly, the rider includes a factor to pass through savings that are generated in the operating costs. It has to be analyzed no less than every three years to make sure it's updated, as well as every year the cost passed through needs to be reconciled. How is the depreciation treated in an infrastructure situation where they're replacing parts? Does that depreciate the part being replaced to zero? The old part, I believe, would be depreciated to zero, Your Honor. And how would that impact on the rates? Doesn't that happen? Isn't that a double-edged sword? Because to an extent, it reduces the investor contribution. On the other, it creates an expense. Those retirements are addressed, I believe, in the context of base rate cases. What happens to it when it's in a rider? I think it's your question that having already considered the depreciation and setting the overall rate, is it also considered how that depreciation gets affected by the fact that you've pulled out those assets that you've given credit for their depreciation? If I believe I understand your questions, I believe the answer is yes, and it's part of the reason why there's a lower rate of return. The rate of return for the rider was downward adjusted 162 basis points to account for these factors and the impact on reducing the risk posed to recovery now on the cost of investments. So I believe that has been taken into account and worked through in setting the overall rates. But that the savings generated that were a concern. I don't fully understand it, but I'm hopeful that when we get to the other arguments, some effort will be made to help us with that. And I really haven't been keeping track of my time, but I think I possibly have reached my nine or ten minutes. We're not doing really well in trying to hold this down. But I think, like my previous colleague, I think through your questions, there's one other point I would like to raise is this idea that while we don't agree with the second district standard, and I think we've said it in a recent year, these aren't really different cases, though. I mean, you want to look at it factually. We have a savings factor to flow savings through. Customers aren't losing any savings with Rider ICI. They're going to be flown back to the customer. Secondly, I don't think it's fair to characterize this replacement, the upgrade of the mains as voluntary. No one disputes that these old pipes need to be replaced. No one really does. It's on the schedule. Yeah. It's on the schedule. And, you know, in fact, it's in the brief the commission ultimately basically ordered acceleration to occur. So it's a question of it being voluntary. It's voluntary in the same way that every single environmental message is voluntary. It really needs to be done based on objective outside factors. Except more predictively. Well, I think possibly not. Year to year. I mean, what the street is, what the city is doing, nature. There's all kinds of variables that do make it a little bit unpredictable, and that's why one of the issues in the underlying case was micromanaging and what roles should be done now and how important it is. We know what pipe is where when. It really is a year to year question, and there is some variability and it's a little bit difficult to predict what needs to be done on a year to year basis. Thank you. Thank you. Next. All right. Refresh us on your self-identification. My name is Brad Jackson. I'm with the Laughlin Affiliate, and I'm representing the utilities on the return on equity issue. At the risk of replowing a little old ground, I want to put the return on equity issue in context, the context of the rate case. The public utility is entitled to recover its reasonable operating expenses along with a reasonable return on its investment. Some of those two things is the utility's revenue requirement. The goal of utility rate making is to allow the utility rates that in turn allow it to recover its revenue requirement and earn its return, nothing more, nothing less. Part of the utility's return includes a percentage rate of return on the equity that's contained in its capital structure. Utility's capital structure typically has a portion of equity, which is investment, versus debt, which it owes to other parties. What happens when you have infrastructure replacement to the new construction? How does that figure into the value of the equity? Is that considered investor-provided or consumer-provided? Since you have a rider that puts the money where the consumer pays for it on the spot, generally, what does the commission do with that? Good question. An important aspect of the Rider RCR, I believe, is to manage the utility's capital costs, the costs it incurs in borrowing money or issuing stuff. Now, the normal course of things apart from Rider, any investment in infrastructure would add to what's called the rate base, the utility's investment, dollars invested in its system, and to that they earn a return, and then that's set by the commission. Here in 2009, they set people's gas ROE at 10.23%, North Shore at 10.33%. So that's what they would earn on the equity portion of their rate base, which would include the cost of forecasted investments in the test year. Now, under Rider ICR, those new investments are added to the rate base, and the utility does begin to earn on that additional investment. So it's kind of a double-dipping. Well, no, because the commission took into account the fact that because they are essentially guaranteeing recovery and guaranteeing quick recovery of those costs, the utility's risk associated with that investment is lower, and the rate of return associated with those ICR dollars is reduced. But that's very small. Well, compared to the 10.x%, the reduction was 162 basis points. I took it down to, I guess, the mid-8s, high-8s. You're getting down close to the debt cost range there. So the utility, looking at it from a financial standpoint, is not making a great margin over the cost of debt at that point. In any event, I guess one could argue whether the deduction was enough. But it was considered. It was absolutely considered and taken into account, absolutely. Now, getting back to determining the ROE, it's not a number you can simply calculate. The commission has long relied on financial models that use proxy groups of utilities that are similar to the utility before it to develop a market cost of equity. And then the commission determines this market cost of equity. That's the proxy model. That's the proxy model. A group of utilities similar to the utility before you, they run these models that determine a market cost of equity in the marketplace. What would you have to pay, essentially, to have investors buy your stock? Now, in these cases, the ICC determined that the market cost of equity for the utility for these utilities was 10.73%. It then applied two sets of adjustments, combined, reduced people's gases ROE by 50 basis points and North Shores by 40 basis points, and we challenged both of those adjustments. First, we challenged the commission, where we have a commission called its financial risk adjustment. This purported to show that the utilities had less financial risk than the proxy group that was used to develop the market cost of equity. And as we've shown in making this comparison... Well, you know, there's something a bit of a parallax here that is confusing me. If you have a return of equity, once you establish the value of the equity, and presumably assuming you could establish the value of equity without looking to the return of equity as being the predominant factor in valuing the equity, you know, I suppose here you can because the commission appropriates that. But what risk is there? Because if they determine the return in advance, then there is no risk because to the extent that you have a more limited user population, or, you know, rate payer population, the return will... the rate will be increased accordingly to provide the rate of return that the commission decides is appropriate. If I understand your question correctly, yes, the rate of return is set tied to the rate base, the investment. So if you have, let's say, a warm winter, the rates will increase to make sure that the investors get their rate of return. So now, yes, you want to determine the rate of return by the risk involved, but the rate of return basically preempts the risk. Well, what the commission does, though, it determines what the market cost of equity is based on the proxy group. In this particular case... But that's totally unofficial, then, in that sense. Well, I was going to... let me finish. The commission looked at things like the coupling mechanism, which gives utilities either extra recovery if the weather is warm or requires refunds if the weather is colder than expected. Those do affect the cost of equity of that proxy group. In this case, the commission looked at that and actually adjusted these utilities ROEs down by 10 basis points to reflect the fact that we do have decoupling. So the risk effect of riders, as you mentioned, are taken into account by the commission. The utility remains at risk, though, over costs that are in its control. The utility cannot control the weather. The utility has moderate control on... well, little or no control over, like, gas costs, the cost of gas that it sells to its customers. But in terms of costs of its own employees, costs of its own systems, those costs remain under its control, and how it does managing those costs affect what it actually earns compared to what its authorized return is. And that's generally lower rate of what it actually earns. In recent history, these utilities have not earned their authorized return by some amount. That's correct. So despite having these riders... Despite a 10.23 rate of return, they'll earn a 5.86. Exactly. Serious under-earnings. And that may not sound catastrophic, but in the real world, as credit rating agencies look at you and see that you're not earning your authorized returns, they may decide to reduce your credit rate, which in turn increases your... But why doesn't that generate another rate? It sometimes does. It sometimes does. Now, our challenges to the financial risk adjustment. We have two complaints about how the commission, as I say, tilted the scales against the utilities in making that adjustment. First, they ignored evidence that showed that the financial risk differential between the utilities and the proxy group were outweighed, offset by other risk factors. And secondly, let me just try to see where we're heading on this. You, I take it, agree that the commission should have the discretion to go to the rider because of their expertise in analyzing all of these individual requests for increased cost recovery. Yes. And you challenge their expertise in application of these factors. Yes. However, we do not challenge the commission's discretion to make the inquiry that they did here. You say they complied improperly. There's problems in the methodology which result in arbitrary results. Yes. And we've all read the case law precedent on the really profound respect we are to give the expertise of the commission. But it's overwritten in this case because of what? The best formulation of- I think we're, at least speaking for myself, I feel I'm amply demonstrating why the respect for the commission. I think we all have. They are the great odds. The best formulation that I can point to in terms of where this fits within the This comes out of a central Illinois public service company versus ICC 644 Northeast 2nd 817. It actually affirmed the commission. But the standard they used is instructive here. The action of an administrative agency is arbitrary and capricious if the agency, among other things, offers an explanation for its decision which runs counter to the evidence before the agency or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. And we believe that we've identified errors, just plain errors here, where the commission's methods don't hang together logically or factually. The second point regarding the financial risk, are you arguing against the commission on its stand on incentives? Yes. Okay. Because that may very well demonstrate a situation where you can easily see how there can be a broad differential in the expense factor, which can be reasonable and prudent. But if it's designed to benefit shareholders, according to the commission's standard, then it will not be recoverable and it can, therefore, not be considered an operating expense in terms of filling its revenue requirement. So you'll get a difference there. So that can become an important consideration. Yes. So my colleague, Mr. Adeswani, will address the incentive account recovery issue. If I could just briefly summarize the second issue with the financial risk adjustment. An apples and oranges comparison. To determine the financial risk differential between the proxy group and the utilities, they compared what the utility's credit ratings would be if they recovered 100 percent of their 2009 revenue requirements. A hypothetical ideal situation against what the proxy group's actual average credit rating was based on actual financial performance. Again, we see that as a plain apples and oranges comparison, especially so if you consider the utility's recent financial performance, which was anything but ideal. I think, as you mentioned, Justice Gordon, that the utilities had significantly under-earned their returns in recent years. So the idea that we can safely assume that they'll earn 100 percent of their revenue requirement in 2009 is unrealistic. And it's not surprising, then, that this unfair comparison of hypothetical ideal financial performance to actual historical performance resulted in an adjustment of the ROE downward because the utilities look pretty good compared to the proxy group in terms of financial strength and risk. And we also challenged the second set of adjustments. Now, isn't that the result of ultimately imperfect means of evaluation? To the extent that you look to a proxy, it's basically, at best, a kind of loss. And whether there's a methodology that would more effectively or realistically evaluate the value of the equity, that differential would disappear. Absolutely, Your Honor. And again, we agree the Commission reasonably inquires whether or not the utilities really do or really are similar enough to the proxy group so that the return on equity developed with the proxy group is applicable to the utilities. Absolutely, that's an appropriate area of inquiry. But the methodology that the Commission used here resulted in an unfair comparison between the utilities and the proxy group, one that turns out to be punitive because it reduces the return on equity for illogical and unfair or non-factual reasons. The second adjustments that we challenged are the reduction of the utilities' ROEs by another 20 basis points to reflect the riders VBA and UAE. These riders were designed to ensure that the utilities recovered portions of their revenue requirements. And for purposes of this appeal, we would concede that those would have the effect of reducing the utilities' risk. However, in this case, these adjustments constituted double counting of that risk reduction because the financial risk adjustment that the Commission had already made already assumed that the utilities would earn 100% of their 2009 revenue requirements. And if you assume that, then no rider could have any effect, any further effect on the utilities' revenue requirement recovery. But don't you have to assume that, whether it happens or not, because otherwise you're working totally with almost an irrelevance of fiction. Well, if you assume that, though, and then adjust the ROE based on that assumption to that point, to reduce the ROE down to a point where you're assuming full recovery, there's no further reduction you can make based on other factors. Aren't we dealing with a situation where the Commission is valuing a number of factors and exercising its discretion in granting this rider in the first place? Isn't what you're really telling us to do is to take certain items off the scale, which presumably they have already considered in making their ultimate decision? And every time we take something off or add something on to the scale, haven't we tinkered with their exercise of their discretion in the first place? We're only asking that they exercise their discretion in a logical and fact-based way. This is an actual impact of that, that if we were to take one item off, that we should send the entire matter back to them for reconsideration, because who knows how they would apply their ultimate decision in the absence of these factors that we removed. I think that would be an acceptable result from our standpoint, Your Honor. I think we've identified these errors. I'm curious whether everybody else representing utilities agreed on that, but maybe they can address that. I don't know. Well, for example, if you reverse... You may be giving away a whole lot more than you're seeking in your aspect of what you're... I guess what I was thinking was that if you were to reverse the rider adjustments, I'm sorry, if you reverse the financial risk adjustments, upheld the rider adjustments, perhaps they would take another look at the financial risk aspect and do it differently in a way that was logical and fact-based. Maybe the fact that this is something that requires an entire new rate case. We don't know. That would be within their discretion, yes, Your Honor. Absolutely. You know, we're just asking them to get it right and to do it in a way that can make... Everybody always asks everybody to get things right. We do our best, but we don't always succeed. Well, we think we've identified plain errors here which can be corrected. If you were to uphold the financial risk adjustment, then our position is that you must reverse the rider adjustment as duplicative. If you were to reverse the financial risk adjustment, we would concede that the rider adjustment should stand. Certainly, it could be subject to remand to the Commission for Procedures. I grant you that. Thank you. Thank you. Well, you have negative six minutes to go. By the time I'm done, people may think I lost ground. Good morning, Your Honor. Again, I'm John Ratnaswamy on the incentive compensation and the pension issue on behalf of the utilities. On the incentive compensation issue, understanding the flow of some of the discussion, I'd like to sort of drop in a sense to the bottom line. So let's say, although it is not our legal position, that the ICC actually had the discretion to adopt a standard that would deny prudent and reasonable incentive compensation costs. And in this case, everyone agrees they are prudent and reasonable. And let's even say that the second district, not in the rider case, but in the other second district case that's been cited a lot, was right that they could adopt a customer benefit standard. Then would you still affirm the Commission or would you reverse the Commission? And I would say you would have to reverse because, well, so that own standard must be true. And the Commission, in having adopted a customer benefit standard, can't then say we are going to close our eyes to certain customer benefits and pretend they don't exist or weigh them at zero when there's nothing in the evidentiary record or logic that supports that. Well, we may want to look to see how directly or indirectly it becomes a customer benefit. Right. So let's stick with one of them, Your Honor, one of the district benefits. It's uncontested that the total amount that's paid out to employees is a prudent or reasonable amount. And it's uncontested the way utilities set their compensation. It also depends to whom it's paid. Pardon me? It depends to whom it's paid. If it becomes a return to the shareholder, although indirectly, they may provide capital or investment that benefits the customer. Still, I can't see why we should want to challenge the Commission in saying, well, that's not really customer benefit. They're simply basically pacifying the shareholder. Well, okay. Skipping to the legal argument, which is responsive to that, the BPI, the first case commonly known, I think, is BPI 1 in 1991. The rates have to be just and reasonable to the shareholders as well as to the customers. And permutating the Commission's standards seems to be the notion that somehow the shareholders are second class in this equation. But that isn't the argument I'm trying to make. I'm trying to get to one of the benefits which directly benefits the customers and you don't even see it discussed in the discussion part of the Commission's order. And that is when the Utilities set total compensation with the advice of the infant expert, there's a base pay amount and there's the incentive amount and the other benefits amount. And that total is set based on what's prudent and reasonable for the market and no one has disputed that in this case. That means that when they were setting the total compensation and they said, this amount of the total is going to be the targeted incentive pay amount, that meant that everything else was less by that same amount of dollars. They didn't set base pay and then have a separate decision where they set health insurance benefits and then a separate decision where they set the incentive pay. They set a total. And so when you have the incentive compensation, it trades off with the other elements of the compensation. So an extra, figuratively speaking, $10 of incentive compensation means $10 less of other forms of compensation. That goes directly to the customer. That's not a rule of physics though. I mean, it doesn't have to happen that way. It doesn't have to happen that way, but the evidence is that it can happen that way. Because it could just be an additional perk. And wouldn't one want to, for example, you know, there's some real expertise involved here in evaluating employment wage rate totals, and wouldn't the union be the one who might have a better voice on this than management? They could be. But again, Your Honor, there is no evidence. And isn't the union in favor of this? They are. But there is no evidence that this is a perk. There is no commission finding it's a perk. There is nothing from the commission at all in its own order that suggests this is somehow extra money. It's a kind of bonus. Because that isn't what the record supports and the commission didn't and couldn't find contrary to what the evidence is, which is the total is set. And so these amounts trade off within that total. So when the commission says we're going to disallow, as they did here, approximately $7 million of incentive compensation, they are placing zero weight on the fact that that traded off with $7 million of other compensation being reduced. And you will not find a rationale for that in the commission's order. In addition, why would one want to reduce $7 million of other compensation and package it as an incentive instead? What's the rationale for that? So Mr. Hoover testified. If it's not to benefit certain classes of employees over other classes of employees who are in that sense correspondingly related to consumer benefits. So you may be rewarding the management in their salary scales more so than you have to because management is in a position to feather its own nest as opposed to attracting the best pipe fitter who can service a customer. All right. So, Your Honor, those could be the facts, but again they're not. For People's Gas, of the roughly $7 million that was disallowed, $4 million of that was for non-executives. It was for regular employees. So substantially more than half of it is for regular employees. The plants in this case aren't all stock options for the CEO or something. We're talking about the regular employees here. And similarly for the... Yeah, but that may be cosmetic to cover, to mask the perks for the managerial employees. Well, you know, that was an interesting statement in the ICC's brief, and I think that was something of a low point in their brief because frankly no witness for any party ever argued that in this case. But that's not the conclusion of the ICC, though, on this record. I don't think so, but even if it potentially could have been, it is not one of the reasons that... It's not express. It's not. They give express reasons, but that's not one of them. And it's hard for me to see how when the vast majority, in the case of North Shore it's something like two-thirds of the cost that was allowed, again, are not for executives, how someone could find that somehow that was a subterfuge for paying the executives. Because that's not where the money is going. As to the question Justice Gordon asked a little while ago, well, so why do you do this? Why not just pay everybody face-to-face? Right, because you could do that and we'd be here today, but I wouldn't be. Well, I guess I'd be here for the pension issue. Mr. Hoover testified, without contradiction, that by having part of the compensation be incentive, that helps attract, not just helps attract employees, but it helps attract more motivated employees, helps attract better qualified employees, and also incentivizes the training and it reduces training costs. For the training cost piece of that, you won't find a reference in the commission's order to recognizing that. Now, did we quantify that? No. What you had was the testimony of an HR expert saying this is a better way to reduce training costs. Isn't it the goal of the commission in the treatment of this monopoly, which gives them these regulatory rights, to look for austerity since they are guaranteeing rates, they are reducing risk, they are looking for the comfort of their constituencies, the consumer public, and they're not going to let you do what, at this point in our economy, we even resent banks doing because they accept government largesse in terms of bonuses. Right. Well, the utilities aren't recipients of government largesse. I mean, they have trouble enforcing it. So, that's what, I mean, about half of the, I don't know, 300-page order of single space in the commission is going sort of line item by line item on the utility's costs. This one's prudent, this one's not, this one half is, you get half of it, and so on. On the incentive compensation issue, again, no one, not even the order, suggests that too much was paid. This is not like the DuPage case, which is cited in the briefs, or the Candlewick case, which is cited in the briefs that the second district relied on, where you had people who didn't show up, you had a president who didn't show up for the utility, who didn't show up for work. You had people who were off doing something else, and if they were still being paid as if they worked at the utility, where they were being paid more than their peers. You know, if we had those kind of issues, yes, we'd have disallowances here. But, again, it isn't contested that what utilities as a whole are paying out for the incentive compensation is prudent and reasonable. Being mindful of the time, I would just like to make one more point and then switch to the pension, where, although I'm not an accountant, I will try to explain it. The other point is that a substantial amount of the incentive compensation costs that were disallowed were based on net income, and the ICC's brief on appeals suggests, well, if employees are motivated to be concerned about net income, they might just worry about the revenue side. But, as you say, we're focused on the cost side, too, Your Honor, and net income is the tradeoff of those two things. So, it isn't logical to think, if we're trying to improve the bottom line, we're only going to look at this half of the balance sheet. They were given an incentive that also applied to the cost side, and in cases where the metric for the program has always been cost control, I think 100% You're telling me what you mean by metric. So, the One of the terms that I worked for some The measure. So, to give an example from a prior case, you know, one of the metrics, for example, is reducing the number of gas leaks. So, that's a metric, and there's different targets for each metric, and a piece of this is that some of the plans had two layers. They had a net income metric, and then, if that was satisfied, then there were metrics beneath that. Everyone agrees the metrics beneath that, I think, meet the commission standards, or at least to date, they've never argued otherwise. But all I wanted to conclude on the net income point was, it doesn't, the employees are incented to control or reduce costs, as well as to focus on the revenue side. On the pension side, unless there are any other questions about the incentive compensation. So, there's two kinds of post-employment benefits. Unfortunately, for me, they only fall into two buckets. One is the pension, which is accounted for separately, shows up in financial statements separately, the pension plan, excuse me. And then, thankfully for me, so it's simpler, there's what they call OPEB, which is everything else. It's all the other post-employment benefits, OPEB. So, what the commission does, in this case and in other cases, some other cases, is it said, if your retirees are owed those non-pension benefits, and you don't have enough money saved up to pay them, such that there's a liability on your balance sheet, we're going to deduct that from your rate base. Because that's an investment you didn't make, that you said, you know, so we're going to deduct that, you won't get a return on that. Is that what you call the negative revenue? No, there's the negative, sorry. There's the negative pension expenses, which is a different point. Then there's the pension. And the commission, I think consistently, I don't know of any exceptions, when that, the pension has been calculated to be a liability, they have always subtracted that from rate base two. But when they've gotten to cases where the pension... The accumulated fund? So in... What is in that rate base? And what's the source of that rate base? How much of it represents employer contribution, as opposed to employee contribution? Okay. Are you asking about the whole rate base? Yeah, I mean, I just want to get... Okay, so in general, and the numbers will vary between utilities and cases, typically investments in plants are something like two-thirds or more of what's in the rate base. So, you know, in the case of electric utilities, things like poles and wires and transformers. In the case of the gas utilities, compressors, and the lines that you've heard about. Both kinds of utilities have meters. Those are all capital investments. And that's the biggest thing in... I'm talking about with regards to the pension. Oh, okay. So the pension, what part of that pension could arguably belong in the rate base? Oh, well, if it's a positive number, we would say all of it is, because... And now I'll say some facts that aren't... Even those... That part of the pension, that represents employee contribution? No. The amount we're talking about does not include employee contributions. That's not been suggested in the case, no. And what about the employer contribution? Right, so... Why isn't that when it's made an expense, an operating expense? So... I'm just... So when an employee contributes his share of the pension, does that count as an operating expense? No. On the... Using financials, we can go, yes. So on the income statement of the utility, you will see the pension expenses and the OPEB expenses. Those could be a positive number or a negative number in any given year. On the balance sheet, you will see these balance sheet items for the OPEB liability or asset. It's almost always, I think, a liability. And for the pension asset, it's a liability. Sometimes it's an asset. Sometimes it's a liability. Depends on utilities and the facts. When the utility puts money into the pension plan, that doesn't go into the revenue requirement. It's not part of the expenses that go into the revenue requirement. And under the commission's approach in this case, it's not part of the rate base either. So... All that money that the utility has put into the pension plan, which among other things, helps reduce pension expense because there's gains on it. Utility doesn't get any return on that. So in people's case, there's about 90, 155 million gross, 96 million net on their balance sheet. They own it. They made the contributions. They literally wrote the checks that bought the assets that are in the plan. Oh, but they don't know. They do know. They make the contributions. It's subject to statutory regulation, isn't it? They still... They don't have a proprietary... They are still... ...investment in it anymore. It's totally regulated, isn't it? What happens with the money is regulated. But legally and in accounting space, let me put it that way, they are the owner of that pension trust. You'll find it on their balance sheet. What can they do with it? Can they have it sit there? So could they just pull the money out? You're right, Ryan. There's legal limitations on that. It's in a trust. That's right. But they are still the ones who put in the money in that trust. Everyone, unlike the incentive comp this year, everyone agrees it benefits rate payers because having the money in there helps to pay for the pension expense and helps to reduce the pension expense. So... Unless the pension expense is an unauthorized incentive. Right. But no one has argued that on the pension side. Of course, we think they would be mistaken on the incentive compensation side. Weren't the funds supplied by rate payers? Isn't that the problem here? So that is the theory. And there are two witnesses who said that. And if you look at their testimony, Mr. Efron and Ms. Pierce, there's no facts under that. That is a matter of theory or faith or something. I don't know what it is. Because it's not tracing money. It's not looking through the balance sheets and income statement and saying, somehow the customer has paid for that. And the revenue requirement, all they're paying is the expected amount of the accrual of... Right. Well, how could it be anything else? How could it be anything else? It's not the investor equity. I mean, investors, when they invest, buy something. So when this pension accumulates, it accumulates as a result of income derived from the rate payers, isn't it? No, Your Honor, it's not. This is a capital investment just the same way when the utility writes a check to buy a new compressor for part of their distribution system. This is money coming from the utility. And if someone... But the utility gets its money, by and large, from the rate payers. Well, but they also have investors. I mean, that's why, you know, there's hundreds of millions of dollars in rate payers because everyone agrees the investor's funded that money. And so the factual question, if you want to call it that, but I'll go with the factual and legal question, is, okay, who paid for this? And the commission's order says the customer has paid for it because Ms. Pierce and Mr. Efron said so. But there's no facts under that. I think we understand your point. It doesn't mean we agree with it. Right. I've been used to more than that. Right. But I do want to say there's both a factual point and a legal point. One of the standards of review is a commission's factual finding can be reversed if it's contrary to law. And we do have two arguments for why it's not just wrong on the record, but it's contrary to law. Thank you, Your Honor. Thank you. I didn't say we'd disagree with it either. Good morning, Your Honor. It's still morning? It's still Tuesday, too. Again, I'm John Keller. I'm representing the Illinois Commerce Commission. Of the two issues, I'll take the one that was most recently discussed. First, the incentive compensation. There are certain expenditures that are not recoverable in rates, regardless of whether or not they're just unreasonable or prudently incurred. And the Supreme Court said that long ago in that 1973 case, where it disallowed recovery of lobbying expenses, it disallowed recovery of dues for civic organizations and things like that. Those are perfectly ordinary expenses in a normal corporation. No one bats an eye at something like that. Nothing stops the utilities here from gearing their incentive compensation plans to be recoverable according to the standards of the commission, but they have chosen not to. No one here is arguing that the level of compensation is a problem. It's just that what are they incenting their... Is your argument that what they're trying to do is to improve their own profits? Well, it's unclear what they're doing. They have several metrics, again, regarding net income, and part of that might be or could be considered to be lowering costs, which is a direct benefit to rate payers, but we don't know what portion of that is. And so the commission has developed a standard over the years where you get some tangible benefit. Maybe it's in improving service. Maybe it's coming up with a new service when people call in, a new system so people are dealt with more fairly or more quickly or something like that. Or if it lowers the cost of service. Those types of things are the things that the commission... Well, wouldn't you ultimately have to look to see whether these costs are In other words, does the company have a choice in not undergoing this expenditure without compromising its service to the rate payer? I think that's exactly the point. No one is complaining about them getting a certain level of incentive compensation. It's what they're incenting their employees to do. It's not clear what they're... No, but in terms of measuring what they're doing, if what they're doing is not a factor that plays into the delivery of services, then it becomes a matter of choice. The company could totally survive without undergoing that expense, without in the least bit hurting the rate payer. And in that case, the monopoly that is being regulated here does not require a rate of return to be derived from that expense. On the other hand, if it's something that facilitates the operation of the company where the company could not perform its service with the same quality and the same expense without it, then it becomes something, at least, that Prima Vachie, I would think, ought to be considered a customer benefit. If you're asking me whether I... That's a question. I agree that if this is something that's not necessary, if what's the makeup of their incentive compensation isn't something that that it is not a necessary portion of the employee activity. And it shouldn't be reflected in rates as an expense. So you're not objecting, at least in theory, to the demarcation between customer benefit versus rate between the shareholder? No, it's just whether or not something goes to the benefit of rate payers, either by improving service or lowering costs or something like that, which end up benefiting rate payers because... Lowering costs does not benefit rate payers unless it facilitates a reduction in rates. And that would be determined on the basis of the rate-based computation. You can lower costs without the customer receiving any benefit. But isn't it that if that happens, then we could reduce the rate that's charged to the consumer down the road, and that would be a benefit to the consumer? It's a benefit in that, yes, at the next rate case, you reflect that lower cost of service. It also enables, if all other things are changing in base rates, some expenses are going up, some are going down. It would enable the utility to stay out from coming in for a rate case increase. So it has that effect. It has a potential. It has potential. Basically, the utilities here want to be treated like normal corporations who can incent their employees any way they want, but they're not normal corporations. They're public utilities. They're closed in the public interest. They provide a public service. They provide gas in the middle of winter. The public has an interest in things, and that's why over time the standards have developed  you should have a tangible incentive. You should have a tangible, not an intangible idea in mind, and that's why that flows straight out of the Illinois Supreme Court decision, and it's recently been affirmed in the 2009 case before the second district appellate court, which we call comment one because there's going to be a comment two that I'll be referring to in just a little bit. And I don't know how much more there is to say on that issue, so unless you have questions I'd like to move on to the rider. And the question really is, the argument's been going on, the question is really in my mind whether or not the current regulatory setup is nimble enough to provide for the commission to enter an order which allows and incents utilities to be able to do something they might not necessarily do, but which has stated benefits that appear on the record, environmental benefits, safety benefits, cost of service benefits. And again, just because cost of service is going to go down because of utility action doesn't mean much unless rate payers can eventually recapture that. So what is reasonable and what is fair about this rider is that it takes a utility activity that's maybe not going to have to play out until 2050, but which has great benefits and great net value and makes them accelerate or incents them to accelerate their program, but at the same time realizing that if there are operational savings that happen directly because of this, that some of this flow back to rate payers. And they make an estimate of it. And if the estimate turns out to be not exactly on point, then there's an opportunity to change it down the road and to refine it. And so in looking at the cases, I think the commission has very, very broad rate making authority. Do you disagree with Finkel, for example? We certainly disagreed at the time, Your Honor. But Finkel, importantly I think, was in between rate cases. The court looked at those and said they look like just ordinary expenses and they're already included in your rates. They could be included in the base rate case. They're de minimis. They just don't seem to fit the category of an important enough or unique enough cost to be given rider treatment. And because it was in between rate cases, it brings up a host of considerations because in effect you're taking something that's in base rates outside the rate case and changing it and giving someone an extra recovery that they might not have. What we've done here is, in the context of a rate case, set up the entire revenue requirement for this company, considering everything. There's no single issue rate making this case because the commission considered everything. It didn't take just one element of the revenue requirement and change base rates because, no, it looked at everything, employee salaries, it looked at rate of return, it looked at the value of rate base. So there's no question at all that what the commission did here is not single issue rate making. It also didn't violate the test year because a test year violation also occurs inside a rate case. If you try to take something from an expense item from one year, calendar year, and say another item from another year and you mix them and match them and all of a sudden you come up with a greater revenue requirement than you should have had, that's the problem with violating the test year. That doesn't happen here. Retroactive rate making, that's a concept. The Supreme Court recognizes that when you have a rider, you have a true offender. They commonly have reconciliation provisions. That's because the nature of the commission's inquiry is different in the two types of cases. In a rate case, the commission takes a snapshot of current utility operations, makes a decision as to whether all of those costs are just and reasonable, and then sets base rates. It's perspective. It's perspective. It operates perspective as opposed to making retroactive changes. That's correct. So once that's set, that's what the utility has to charge. And if it turns out later that they're wrong, that's still the appropriate rate. There's no refund unless and until a court overturns. The inquiry with a rider is different because it says, well, I should take it up front. So we're going to look at this to make sure at the end that you charge what you actually should have and what you charge is just and reasonable and prudently incurred. And that's why retroactive rate making has no role in a discussion of a rider because riders, the way they're designed, there is no retroactive rate making. And besides, again, a retroactive rate making is something that you look at a base rate and after they're charged, you say, wait a second, I think you made a mistake. You have to refund it. That's retroactive rate making. What's the rationale for preventing retroactive rate making at least to the extent that it would reduce the rate retroactively? I could see how stability, the necessity for predictability and stability by business generally, has to be able to count on the fact that once the rate is set, it's not going to be altered to their detriment. But if it's going to be a reduction, why not? Your Honor, I don't see a problem with that, but I think the utilities would. They would not want it to be a one-way street. What you do is once you set these there, everyone takes... Because the retroactivity, Dan, is for purposes of, is for the benefit of the rate payers. But if, in fact, the company overcharged and has the wherewithal to make a refund, why would the retroactivity impress us with its sanctity? Well, I don't necessarily think it should, and I think the Commission... I'm asking the thoughts here in regards to chicken houses. But I'll talk with you anyway. But there was a case back in the 80s where the Commission, in regards to... This is not cited in our brief, and I haven't looked at this, but where the Commission had kind of a prelude to alternative rate making where it wouldn't just be base rates and rider rates again. It would look to see what the company actually earned, and if it earned more than a certain level of rate of return, there was going to be a refund. And the Second District said, you can't do that. That's retroactive rate making. And so the Commission obviously thought that was a good deal for rate payers, but the Second District said, no, you can't. So I don't know that there's a specific rationale that justifies flowing things back to rate payers if the utility has somehow made a mistake within a program, but that I believe is the law. Anything else? A good answer here would be no. Since we're on a mountainside. Well, I will defer to you, Your Honor. Thank you. Good morning, Your Honor. I'm James E. Wagon, Special Assistant Attorney General on behalf of the Illinois Commerce Commission, and I'm taking up the return on equity and pension asset issues. I want to begin first, since the Court asked this question. You begin with the revenue requirement formula that the Supreme Court and many other courts have said that the revenue requirement equals essentially the operating cost of the company, it's usually designated in the C if I remember, plus investment times a small r, which is return on investment. Now, the utilities in this case have raised an operating cost issue, the incentive compensation, the pension asset, which is an investment they're looking to receive, and the return on investment, the cost in common equity, goes to determination what the return on investment should be. These companies have a relatively simple capital structure. There's only two components, equity and debt. The Commission determines the debt by looking at the companies, what they actually are doing on long-term debt, $3 million at 7 percent, $12 billion at 2 percent, and you come up with that cost. That one's usually not too controversial, but equity always is because these are wholly owned subsidiaries of a holding company. They don't issue equity. The holding company issues equity. In some respects, their equity supports what the holding company does. And that's why, for example, in Section 9230, the Commission is supposed to look at the sister corporations that are also under that holding company's umbrella to see if the costs... That's the proxy. No, that's not the proxy issue. That we look to the sister corporations, and then if they have increased the risk of the holding company, therefore making the equity at the holding company more expensive or more costly or an investor looks for more of a return, however you want to look at that. We now take that out, and that was the 20-point and the 30-point adjustment. That is somewhat different, though, than the other three adjustments the Commission made. The Commission, of course, made the 10-point adjustment for New Rider UEA. We continued the 10 basis points adjustment for Rider VBA, which was created in the prior rate case in which we did the same thing, and there was 163 basis points for Rider ICR, but that later adjustment didn't go to the overall company. That only went to assets shown and being recovered in Rider ICR. Utilities argue that the effects of the riders must be contained in the various analyses upon which return and common equity is determined. You have these CAPM studies and DCFS studies, and they all begin by looking at other utilities that are publicly traded and trying to determine what kind of return they're getting based on what they are. But as the Court questioned, this is a very imperfect evaluation. The Court is absolutely correct. The Commission on page 123 of the order had a four-paragraph explanation, but basically the analytic models provide a guide, but the matter at hand is not to be resolved by a battle of experts or by a particular witness's proposal. It is the sound and reasonable judgment of the Commission which determines the reasonable rate of return on common equity. The utilities argue there's no evidence in support of what the Commission did, and in the Commission brief we cite to the testimony of Staff Witness McNally, whose evidence the Commission adopted for these changes, this lessening of risk these companies face because of these riders. And I point out that Mr. McNally and the utilities witness had fundamental disagreements over many issues involving this. The issue was a question of fact for the Commission to determine. The Commission had a right to rely on the testimony of staff to make these adjustments and it is the Commission which judges the weight of the evidence that the testimony should be given. The utilities have never shown where in these proxy studies where these other utilities have riders similar to these three. And the point I would make, these utilities have rider PGA, which is the Purchase Gas Adjustment Clause. There's no adjustment of the cost of common equity because of the rider PGA. Why? Because virtually every gas utility in the country has something similar. They don't call it a PGA and they may have some little changes, but they all recover the purchased gas somehow directly, so you wouldn't adjust the cost of common equity. Proxy companies have those kind of things, but it was the utility that was required to show that these proxy companies had something similar to rider ICR so that it would not have an effect on the cost of common equity in these studies. Tell me, does the rate of return on equity determine whether it's going to be confiscatory constitutionally? Ah, Illinois so far in all of its cases follows a classic confiscation issue that if a company makes a single dollar over its cost, it's non-confiscatory. If it doesn't make its cost, it's confiscatory. Now obviously there's been a lot of case law since any case has actually been decided on confiscation in Illinois, but the rule was that as long as the company made a profit, even if it's some marginally minor thing, it's not constitutional confiscation. It may be unreasonable and reversible on a direct appeal, but it doesn't lead to a collateral suit for confiscation. So unless the court has other questions about that, I'd like to just address pension asset for a little bit. The pension asset is created because there's more money in the pension asset than they need to expense. This has largely... They had a very good explanation in their brief about the changes in the actuarial tables so that these monies would all of a sudden show up as being more than they need. So then the utilities for the last 15 years or more have asked for the pension asset to be recognized as an investment of the company. For over 15 years, the commission has consistently denied that recovery because the utilities could never trace the money back to the investors. The argument made, and I actually heard this once made explicitly, the money comes in, it's company money, therefore it's investor money, and therefore we put it in the pension asset and get a recovery. Under Illinois law, and the City of Dalton case was the original one of DuPage Utility, if you take a buck from the great payers and have it now, and you say, oh, now give us 10 cents because I know that's my investment, you don't get a recovery. When it comes to investment, you look to the source of where the monies come from. It doesn't go to the operating expense of whether it benefits the customers or anything else. This has to do strictly with whether the investors invested this money in the pension asset. We've had a very recent case. They cited to it, but they're wrong about it. In the recent ComEd case, Exelon had actually, the holding company, had actually spent $803 million and they put it into the pension. Clearly traceable from the investors. And the commission allowed a recovery of that. Oddly enough, it was treated as debt because it turned out the holding company actually had raised debt to raise the money, so it was a little cheaper than recognizing it as common equity. But anyway, if you can show that, the commission will grant it. If you don't show it, the money is there because it's rate payer money that you put in, and they don't get a right to charge the rate payers for a return on it. Unless there are questions, I have nothing further to say. Thank you. I have two very great points on ROE. First, the question of whether or not the proxy group included utilities with decoupling mechanisms. We had an argument about that below, but that's not among our arguments on appeal. For the record, though, the staff witness conceded that almost all of the companies in the proxy group did have some form of decoupling mechanisms or not, and that's why he recommended a small rider adjustment of only 10 basis points for rider BPA. The other point I want to make, though, to get back to Justice Epstein's questions with me, if the commission in its broad discretion chooses a method, a step-by-step method, for coming up with the ROE and making adjustments to the ROE, that method's got to be reasonable in design, it's got to be logical, and it's got to be applied with facts. If we don't hold them to that, at least, then I don't know what the limit to their discretion is. Thank you. So, if I may, one point on incentive compensation and two on the pension. On the incentive compensation, I'll only point out again, there is no response, your argument as there has been throughout the case, no response to the base pay point, that incentive compensation benefits customers because it trades off against other employee compensation, and it's the total that gets put into rates. On the pension, I think I did not finish an answer to Justice Powell. So, what the customers pay for in rates is the annual accrual amount. What's that? It's how much pension obligation did the company accrue during the test year. The pension asset is prepaid pension expense. It is putting money away to pay future pension expenses. And like all money, it has a time value. So, the utility has put away money to pay pension expense in the future, and it's the utility that put away that money. It is recovering no time value of that money. And one aspect of the bottom line here is... Isn't it by investing the money in the pension fund, realizing a return on the investment, which ultimately lessens the amount of money they will have to pay out from pension down the road? Yes, but when the pension expense amount is calculated, it's put into rates, there is a credit for how much has been gained. So, utility, the amount of the gain that you're talking about gets passed on to the customers too. It sounds like what you're looking for is interest. It is. Essentially, when we talk about the return, we're not asking for the money back. You know, so when you invest in plants, you expect to get it back. You get a return on and you get depreciation, which is actually getting the investment back. Utilities aren't asking for that. That money is in there, it's going to stay in there, as was discussed earlier. What they're asking for is putting it in rates because that is the only way to recover the time value of their having prepaid the pension expense. The time value is the same, is it? Yes. And if they don't get that, then one aspect of this is they would be nuts to put in any more than, you know, sort of with the legal minimum unless they're just going to sort of do it out of the goodness of their hearts and give up the time value of that money. Why would they want to do more than the legal minimum? That money is inert. Why would they want to... Because they think... Sorry. No. You can think of it as, in a sense, saving for a rainy day. You know you're going to have to pay the pension expense someday when you have the ability, and they certainly don't do it every year, but from time to time they make contributions in that knowing they're going to have to pay it someday. So do they have a reason? Yes, that reason I just described, and there is some gain on the investments, at least when the economy is doing okay. But doesn't it also make it a better investment for people who they are trying to attract as shareholders to say that we don't have unfunded pension liabilities in a certain percentage? I mean, isn't there some other ancillary benefit to the corporation, to the utility for doing exactly that? I mean, if we see a company that has, for example, a company in the position of the state of Illinois with their pension, and they try to borrow money, people will look at it and say, well, this is not a very sound entity because they have all these unfunded pension liabilities. That's true, and there's multiple adverse consequences. One thing is because the state of Illinois is so underfunded its pension, when it borrows, when it tries to raise capital, it pays more. It pays a higher rate. Right, so it's not out of the goodness of the heart of the utility. There's benefit regardless of what you say. Yes, you could say there's some benefit that somebody is thinking about investing in the company. Or somebody who is interested in loaning money to your entity would say, well, wait a minute, you're the Titanic here. You're about to go down. What are you going to do when these people retire? Someone could, but nonetheless, I mean, the money is being put away with no recovery of the time value of the money. Not directly. I mean, I think the logic of your point almost proves too much, because then why doesn't everyone fully fund their pension? They don't. There's plenty of companies, government entities, companies, even utilities that don't have funded pensions. So we're relying on the rationality of everybody and all these other corporations to your point. Well, I'm suggesting that means that the benefit isn't so powerful that it causes everyone to fully fund their pensions. Anything else? Thank you. I believe I'm your final speaker today. This is my rebuttal on the rider ICR issue and solely on that issue and none of the other issues. The attorney for the company stated in his argument that there were dozens of riders. That is certainly not in the record. It's not in their briefs. I don't believe it's an accurate statement. The one rider he was referring generally to riders out there in the rates of other companies. And the one rider he mentioned was energy efficiency. And I wanted to point out that's a statutory rider. That means the General Assembly passed a statute that says it is to meet the criteria. I'm sorry, excuse me. So it meets the criteria. We are clearly not challenging the General Assembly's authority to allow for riders in any circumstance that the General Assembly thinks riders make sense. And I would point out in rebuttal to that point about how many riders are out there, there are no infrastructure riders in any Illinois rates, any utility. There's no such thing as an infrastructure rider. The first attempt at one was the one in ComEd Rider SMP that the second district struck down. This is the second attempt at one. And there's a good point. There's a good reason for that. As Mr. Ratanswamy said in his presentation, two-thirds of the rate base for the utility is capital investment. So if you were to take capital investment and move it to a rider, you've taken two-thirds of essentially the revenue requirement. Revenue requirement is operating expenses plus rate base plus rate of return. So you've taken the bulk of the revenue requirement, you've moved it out of the test year process, and you've moved it to a rider. And essentially that's what we're talking about doing here with Rider ICR. There was some, I've mentioned the test year rules many times. In my view, the single issue rate making and the test year rules are the flip sides of the same coin. The test year rule requires aggregate rate making, taking all revenues, expenses for a defined period of time, putting it all into the pot, coming up with the revenue requirement. And when you take a piece out of that, you violate the test year rule in that single issue rate making. I understand there's another type of violation of the test year rule, which is to take things from different years and combine them into a single rate making, into a single rate. That also violates the test year rule. That's not what I'm referring to. I heard Mr. Kelleher talk about how they didn't do that, and I don't think they did that either. The violation of the test year rule I'm talking about is the single issue rate making. It's the same thing. By taking one thing out of the comprehensive revenue requirement, you violate the test year rule and you engage in single issue rate making. And then the final point that I'd like to spend my rebuttal on is this idea of whether or not rate making is nimble enough to incentivize utilities to do something they might not normally do by using riders, which is the words of Mr. Kelleher. The way they've attempted to do that here is through the savings factor. They're going to allow the utility to take their capital investments, recover it through a rider, but then they're going to examine all of the savings that come from that rider. They're going to try and flow those back to the consumers, and then they're going to look at that again on a periodic basis. That's sort of their approach, how they're going to address the single issue rate making problem, is they're going to do sort of mini rate cases every three years that looks at what the savings is from this particular rider. And we think that that approach is antithetical to the way rates should be set, and it doesn't solve the problem and it just compounds it, because it replaces the test year process with kind of a more of a central planning process, where instead of the utility deciding how to run their investment, their plan, two-thirds of their rate base, the commission has come in and said, we think you should accelerate the investments in your plant, in your infrastructure, which is what the utility does. So we're going to step in there and we're going to say, here's some incentives to do something that you don't necessarily want to do, but here's an incentive to do it, and now we're going to stay on you. We're going to watch that for the next three years. We're going to see where the savings are. So you have a much more interactive process between the regulator and the company that is necessary and that has ever been used before. It creates improper incentives, which we talked about, which I mentioned earlier, for the utility to spend more on the infrastructure and the rider, just over cover all of it. It undermines the comprehensive test year process, and it's impossible to be as accurate using this kind of central planning method, where we go back in every three years and try to assess the savings, than the traditional rate-making structure, which inherently takes into account the dynamic interaction between investments and savings and takes one number at the end, the revenue requirement. So that is why the second district's holding is correct, and we hope this court will reach the same conclusion in Rider ICR. Thank you. Thank you, gentlemen. This has been, the arguments, obviously, were superb, both here in court and in your briefs, and I also found them very helpful. Thank you. Thank you all. The case will be taken under advisement.